1  STEPHANIE M. HINDS (CABN 154284)
   Acting United States Attorney

2

3  HALLIE HOFFMAN (CABN 210020)
   Chief, Criminal Division

4  COLIN C. SAMPSON (CABN 249784)
        450 Golden Gate Avenue, Box 36055
5       San Francisco, California 94102-3495
        Tel:  (415) 436-7200
6       Fax: (415) 436-7234
        Colin.Sampson@usdoj.gov

7

8  MATTHEW J. MCKENZIE (NY 4791513)
   Trial Attorney, National Security Division
9       950 Pennsylvania Ave., NW
        Washington, DC 20530
10      Tel:  (202) 514-7845
        Fax: (202) 233-2146
11      Matthew.Mckenzie@usdoj.gov

12  Attorneys for United States of America

13              UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15                    OAKLAND DIVISION

16

17  UNITED STATES OF AMERICA,              )  CASE NO. CR 11-0573-JSW
                                           )
18        Plaintiff,                       )  UNITED STATES' OPPOSITION TO THE
                                           )  PANGANG DEFENDANTS' SECOND MOTION
19     v.                                  )  TO DISMISS AND PARTIAL MOTION TO
                                           )  STRIKE  [DKT 1295]
20  PANGANG GROUP COMPANY, LTD.;           )
    PANGANG GROUP STEEL VANADIUM &         )  Date:      January 4, 2022
21  TITANIUM COMPANY, LTD.; PANGANG        )  Time:      1:00 p.m.
    GROUP TITANIUM INDUSTRY COMPANY,)         Location:  Courtroom 5, 2nd Floor
22  LTD; and PANGANG GROUP                 )
    INTERNATIONAL ECONOMIC &               )
23  TRADING COMPANY, LTD.,                 )
                                           )
24  _____Defendants._____    )

25

26

27

28

# **TABLE OF CONTENTS**

I.     DEFENDANTS' FIRST MOTION TO DISMISS ...........................................................6

II.    DEFENDANTS' "EVIDENCE" THAT THEY ARE "FOREIGN STATES" IS
WHOLLY INSUFFICIENT UNDER THE FSIA ...........................................................8

III.   THIS COURT HAS JURISDICTION EVEN IF DEFENDANTS COULD
ESTABLISH A PRIMA FACIE CASE UNDER THE FSIA ....................................11

     A.     This Court has jurisdiction over this case alleging "offenses against the laws
of the United States," and the text, structure, and history of the FSIA do not
provide otherwise........................................................................................12

     B.     If the FSIA did apply to criminal cases, its exceptions apply as well ..............19

IV.    DEFENDANTS' POLICY ARGUMENTS HAVE BEEN WAIVED AND,
REGARDLESS, ARE UNPERSUASIVE...................................................................22

IV.    CONCLUSION......................................................................................................24

# TABLE OF AUTHORITIES

## CASES

*Adler v. Federal Republic of Nigeria*,
219 F.3d 869 (9th Cir. 2000) .................................................................................... 16, 17

*Alfred Dunhill of London, Inc. v. Republic of Cuba*,
425 U.S. 682 (1976) .......................................................................................................... 10

*ANA Intern., Inc. v. Way*,
393 F.3d 886 (9th Cir. 2004) ........................................................................................... 9

*Argentine Republic v. Amerada Hess*,
488 U.S. 428, 435 (1989) .................................................................................................. 18

*Arizona v. California*,
460 U.S. 605 (1983) ............................................................................................................ 6

*Barapind v. Gov't of Republic of India*,
944 F.3d 824 (9th Cir. 2016) .......................................................................................... 17

*Canadian Overseas Ores Ltd. v. Comanie de Acero del Pacifico S.A.*,
727 F.2d 274 (2d Cir.1984) .............................................................................................. 17

*Dole Food Co. v. Patrickson*,
538 U.S. 468 (2003) ................................................................................................... 4, 5, 6

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*,
894 F.3d 339 (D.C. Cir. 2018) ............................................................................. 4, 13, 17

*Embassy of the Arab Republic of Egypt v. Lasheen*,
603 F.3d 1166 (9th Cir. 2010) .................................................................................. 4, 15

*Ex Parte Republic of Peru*,
318 U.S. 578 (1943) ........................................................................................................... 19

*Griffin v. Oceanic Contractors, Inc.*,
458 U.S. 564 (1982) ........................................................................................................... 13

*Houston v. Murmansk Shipping Co.*,
667 F.2d 1151 (4th Cir. 1982) .......................................................................................... 8

*In re Grand Jury Proceeding Related To M/V Deltuva*,
752 F. Supp. 2d 173 (D.P.R. 2010) ........................................................................... 12, 14

*In re Grand Jury Subpoena*,
912 F.3d 623 (D.C. Cir. 2019) ................................................................................. passim

*In re Pangang Grp. Co.*,
   901 F.3d 1046 (9th Cir. 2018) ................................................................ 13

*In re Sealed Case*,
   825 F.2d 494 (D.C. Cir. 1987) ................................................................ 14

*Keller v. Central Bank of Nigeria*,
   277 F.3d 811  (6th Cir. 2002) ................................................................ 4

*Matar v. Dichter*,
   563 F.3d 9 (2d Cir. 2009) ................................................................ 19

*Morton v. Mancari*,
   417 U.S. 535 (1974) ................................................................ 9

*Pablo Star Ltd. v. Welsh Government*,
   961 F.3d 555 (2d Cir. 2020) ................................................................ 17

*Park v. Shin*,
   313 F.3d 1138 (9th Cir. 2002) ................................................................ 15, 16

*Pasquantino v. United States*,
   544 U.S. 349 (2005) ................................................................ 11, 19

*Republic of Argentina v. NML Capital, Ltd.*,
   573 U.S. 134 (2014) ................................................................ 8, 12

*Republic of Argentina v. Weltover, Inc.*,
   504 U.S. 607 (1992) ................................................................ 15

*Republic of Austria v. Altmann*,
   541 U.S. 677 (2004) ................................................................ 12

*Republic of Iraq v. Beaty*,
   556 U.S. 848 (2009) ................................................................ 10

*Republic of Mexico v. Hoffman*,
   324 U.S. 30 (1945) ................................................................ 10

*Samantar v. Yousuf*,
   560 U.S. 305 (2010) ................................................................ passim

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993) ................................................................ 15, 17

*Tovar v. Sessions*,
   882 F.3d 895 (9th Cir. 2018) ................................................................ 14

*United States v. Aerlinte Eireann*,
   No. 89-CR-647, Dkt. No. 12 (S.D. Fla. Oct. 6, 1989) ................................................................ 14

OPPOSITION TO SECOND MOTION TO DISMISS,
CR 11-0573 JSW

3

*United States v. Campa*,
  529 F.3d 980 (11th Cir. 2008) ............................................................................... 17, 18

*United States v. Curtiss-Wright Export Corp.*,
  299 U.S. 304 (1936) .................................................................................................. 19

*United States v. Hendron*,
  813 F. Supp. 973 (E.D.N.Y. 1993) ........................................................................... 12

*United States v. Ho*,
  2016 WL 5875005 (E.D. Tenn. Oct. 7, 2016) .......................................................... 12

*United States v. Hsu*,
  155 F.3d 189 (3d Cir. 1998)................................................................................... 9, 14

*United States v. Jasin*,
  No. CRIM. A. 91-00602-08, 1993 WL 259436 (E.D. Pa. July 7, 1993)................. 14

*United States v. Nagra*,
  147 F.3d 875 (9th Cir. 1998) .................................................................................... 18

*United States v. Noriega*,
  117 F.3d 1206 (11th Cir. 1997) .......................................................................... 12, 19

*United States v. Sinovel Wind Grp. Co.*,
  794 F.3d 787 (7th Cir. 2015) .................................................................................... 11

*United States v. Statoil, ASA*, No.,
  06-CR-960 (S.D.N.Y. Oct. 13, 2006) ....................................................................... 14

*United States v. Thompson*,
  335 F.3d 782 (8th Cir. 2003) .................................................................................... 18

*United States v. Wright*,
  716 F.2d 549– (9th Cir. 1983) .................................................................................. 18

*Verlinden, B.V. v. Cent. Bank of Nigeria*,
  461 U.S. 480 (1983)............................................................................................. passim

## **STATUTES**

18 U.S.C. § 1831 ................................................................................................................ 2, 9

18 U.S.C. § 1831(a) ................................................................................................................. 9

18 U.S.C. § 1831(a)(1) .......................................................................................................... 7, 9

18 U.S.C. § 1839(1) ................................................................................................................. 4

18 U.S.C. § 3231 ......................................................................................................... 2, 7, 13

28 U.S.C. § 1330(a) .................................................................................................... 8

28 U.S.C. § 1441(d) .................................................................................................... 8

28 U.S.C. § 1603 ......................................................................................................... 4

28 U.S.C. § 1603(b) .................................................................................................... 2

28 U.S.C. § 1603(b)(2) ................................................................................................ 6

28 U.S.C. § 1603(e) ................................................................................................... 15

28 U.S.C. § 1604 ......................................................................................................... 3

28 U.S.C. § 1605(a) ................................................................................................... 14

28 U.S.C. § 1605(a)(1) .............................................................................................. 17

28 U.S.C. § 1605(a)(2) ......................................................................................... 15, 16

28 U.S.C. § 1605(b) .................................................................................................... 8

## RULES

Federal Rules of Evidence 902(3) ............................................................................... 4

## OTHER AUTHORITIES

*Times of Crisis:  Global Regulation of Sovereign Wealth Funds, State-Owned Enterprises, and the Chinese Experience,*
    19 Transnat'l L. & Contemp. Probs. 3 (2010) ................................................... 13

OPPOSITION TO SECOND MOTION TO DISMISS,
CR 11-0573 JSW

According to the Pangang Group Defendants, foreign companies can freely direct their employees to enter the United States, or find hackers who will do it remotely, and conspire to flagrantly rip off American companies and their trade secrets, and American law affirmatively prohibits its own government from doing anything about it.  Fortunately, that is not a correct reading of the law.  Having previously failed to make any showing that they are controlled by (or are an instrumentality of) the People's Republic of China ("PRC"), the Defendants now seek in their latest Motion to Dismiss the Indictment ("Mot.") to prove that they were indeed majority-owned by the government of the PRC.  *See* ECF No. 1295.  But having been given an inch by the Court in the form of an opportunity to seek dismissal on the question of majority ownership that was the basis of the Ninth Circuit's opinion, *see United States v. Pangang Group Co., et al.*, 6 F.4th 946 (9th Cir. 2021)*,* the Pangang Defendants take a mile, rearguing bases for dismissal that this Court already rejected, and additionally arguing bases for dismissal that have nothing to do with their ownership and should have been made before the 2019 motions deadline.  Specifically, the Defendants argue that they are a "foreign state" as defined by the Foreign Sovereign Immunities Act ("FSIA"), Mot. at 6; have absolute immunity from criminal prosecution based on common law, Mot. at 12; and are immune from criminal prosecution based on the FSIA because the FSIA applies in criminal prosecutions, Mot. at 17, but the FSIA's exceptions do not. Mot. at 20.

In the end, as this Court held correctly previously, there is nothing to the Defendants' new arguments.  The United States may prosecute them for committing the charged crimes.  First, the Defendants do not meet the definition of a "Foreign State" under the FSIA.  Second, even if they did, the FSIA does not apply at all because this is a criminal case.  And even if the FSIA did apply, exceptions to it would also apply, and the Defendants have waived the applicability of the FSIA through their conduct in this case.  Finally, Defendants' prudential arguments are unpersuasive.

## I.   DEFENDANTS' FIRST MOTION TO DISMISS

On July 9, 2019, the Pangang Defendants moved to dismiss the indictment, asserting for the first time in over seven years of litigating this criminal case that they enjoyed absolute immunity from criminal prosecution in the United States and that this Court lacked jurisdiction over the case altogether.  ECF No. 1193.  They cited the FSIA for both propositions.  *Id.*  In so doing, the Pangang Defendants'

claim to immunity and to this Court's lack of jurisdiction depended on their identity as "foreign instrumentalities." *Id*.[1]  The government opposed, arguing that the FSIA did not divest the court of jurisdiction in criminal matters, did not apply in criminal cases in general, and, even if it did, the FSIA did not immunize the Pangang Defendants' conduct because they had waived its protections and otherwise fell within the FSIA exemption for commercial activity. ECF No. 1201.

This Court held a hearing on the motion to dismiss on August 13, 2019.  In advance of the hearing, the court issued a notice of questions to the parties, starting with the following:  "Are the Pangang Defendants conceding they are foreign instrumentalities, as that term is defined in the FSIA?  *See* 28 U.S.C. § 1603(b).  Or, for purposes of this motion, are they accepting as true the Government's allegations that they are foreign instrumentalities?"  ECF No. 1211.

On August 26, 2019, in a written order, this Court denied the Pangang Defendants' motion to dismiss the indictment.  ECF No. 1223.  The Court began by addressing "an issue the parties did not address in their briefing, that is whether the Pangang Defendants are 'foreign instrumentalities' as that term is defined in the FSIA."  *Id*.  The Court noted that, at the hearing, the Pangang Defendants had accepted the allegation in the indictment as to their status as true for purposes of the motion—but that the indictment alleged that the Pangang Defendants were foreign instrumentalities under the EEA, not the FSIA.  *Id*.  The Court decided not to wade into the differences between these two definitions, and instead stated that it would, "as they do, assume that they satisfy the definition of 'foreign instrumentality' under the FSIA."  *Id*.

Moving to the merits, the Court carefully analyzed the cases on the FSIA's applicability to criminal matters and concluded that 18 U.S.C. § 3231 granted it subject-matter jurisdiction over the case.  *Id*.  The Court further adopted the reasoning of the D.C. Circuit in *In re Grand Jury Subpoena*,

---

[1]  The Pangang Defendants also asserted that the statute that they were alleged to have violated, 18 U.S.C. § 1831, did not reach the conduct of foreign instrumentalities.  ECF No. 1193.  This Court rejected this claim, and the Pangang Defendants do not renew it in this appeal.  ECF No. 1223.

912 F.3d 623, 627–31 (D.C. Cir. 2019), concluding that, assuming the FSIA applied to criminal cases, its exceptions applied as well.  *Id*.  The court then found that the Pangang Defendants' activities fell within the commercial activity exception to the FSIA:  the Pangang Defendants allegedly entered into and executed commercial contracts with co-conspirators in the United States akin to contracts that private parties could enter, and allegedly built a titanium dioxide production plant and manufactured titanium dioxide, activities in which private parties could engage.  *Id*.  Finally, the Court held that the waiver exception within the FSIA applied, finding that the Pangang Defendants' multiyear participation in the case, including—after years of contesting service—appearing through counsel, agreeing to a trial date and pretrial motion deadlines, moving for bill of particulars, negotiating a protective order, and obtaining discovery and litigation related to discovery including court appearances, all constituted "long and active participation in these criminal proceedings" so as to "amount to an implied waiver of sovereign immunity."  *Id*.  The court denied the Pangang Defendants' motion to dismiss based on the FSIA.  *Id*.

The Pangang Defendants appealed.   The Ninth Circuit did not reach the issues of whether and to what extent the immunity conferred by the FSIA apples in criminal cases.  *See Pangang,* 6 F.4th at 960.  The Court concluded, rather, that in moving to dismiss the indictment, the Pangang Defendants failed to carry their burden to make a prima facie showing that they are instrumentalities of a foreign sovereign within the meaning of the FSIA.  *Id*.

## II.     DEFENDANTS' "EVIDENCE" THAT THEY ARE "FOREIGN STATES" IS WHOLLY INSUFFICIENT UNDER THE FSIA

The FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."  28 U.S.C. § 1604.  A "foreign state" includes any "agency or instrumentality of a foreign state," defined as "any entity-- (1) which is a separate legal person . . . [and] (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state

1  or political subdivision thereof, and (3) which is neither a citizen of a State of the United States . . . nor

2  created under the laws of any third country." 28 U.S.C. § 1603. This definition of foreign

3  instrumentality differs from that provided in the Economic Espionage Act ("EEA"), which defines a

4  foreign instrumentality as "any agency, bureau, ministry, component, institution, association, or any

5  legal, commercial, or business organization, corporation, firm, or entity that is substantially owned,

6  controlled, sponsored, commanded, managed, or dominated by a foreign government."  18 U.S.C. §

7  1839(1).

8      Because Defendants "failed to establish a prima facie case that they were 'foreign state[s]'

9  entitled to immunity under" the FSIA in their first motion to dismiss, the Ninth Circuit affirmed this

10  Court's prior denial of their motion to dismiss.  *See Pangang*, 6 F.4th at 960.

11      Defendants' second bite at the apple similarly fails to carry their burden to make a prima facie

12  case that they meet the FSIA definition of a foreign state.  *See Keller v. Central Bank of Nigeria*, 277

13  F.3d 811 815 (6th Cir. 2002) (The "party claiming FSIA immunity bears the initial burden of proof of

14  establishing prima facie case that it satisfies the FSIA's definition of a foreign state; once this prima

15  facie case is established, the burden of production shifts to the nonmovant to show than an exception

16  applies"); *see also Embassy of the Arab Republic of Egypt v. Lasheen*, 603 F.3d 1166, 1170 (9th Cir.

17  2010); *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 344–45 (D.C. Cir. 2018).

18  A "corporation is an instrumentality of a foreign state under the FSIA only if the foreign state itself

19  owns a majority of the corporation's shares." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 477 (2003).

20      In their effort to make a prima facie case of majority ownership by the PRC government, which

21  the Pangang Defendants have had years leading up to this Court's 2019 order and months since the

22  Ninth Circuit opinion to do, they have produced no capitalization table, no log of shares, no board

23  resolutions.  Instead, Defendants' second motion appears to be based on an Internet research of Chinese

24  websites performed by a law clerk in Defendants' attorney's office.  The documents found by this law

25  clerk are not certified as foreign public or private document to establish authenticity under Federal Rules

26  of Evidence 902(3) or (12), or to establish a hearsay exception under Rules 803(6) (business records) or

27  803(8) (public records).  This failure is telling.  Corporations should obviously have the actual relevant

28

OPPOSITION TO SECOND MOTION TO DISMISS,
CR 11-0573 JSW

1  records (like cap tables or records regarding ownership transaction) needed to establish the identity of

2  their owners if such records actually exist.  They also should have access to the actual percipient

3  witnesses—the executives, board members, or other employees—who could submit declarations

4  establishing actual ownership.  That many years into this litigation the Defendants rely entirely on

5  Internet research conducted by a law firm employee instead of producing any actual evidence

6  undermines any assertion about the validity of their claims.

7       The information reflected in the Internet research is itself highly suspicious.  Specifically, the

8  PRC National Enterprise Credit Information Publicity System search purports to show that Ansteel

9  Group Corporation Ltd. assumed 100% ownership of Pangang Group Co., Ltd. on January 12, 2014.

10  Curiously, despite this purported 2014 acquisition, the listed "announcement date" was nearly *six years*

11  later and took place in the last two months—October 18 and 19, 2021.  Moreover, according to the

12  document, Ansteel's "paid-in capital contribution" date is much earlier—December 17, 2009—and the

13  announcement is nearly 12 years later, October 8, 2021.  All of these "announcements" are dated after

14  the Ninth Circuit's July 2021 opinion in this matter.

15       In short, these appear to be websites ginned up by the Defendants after the Ninth Circuit opinion

16  specifically for the purpose of attempting to support this motion.  Far from establishing a prima facie

17  case of state ownership, the evidence fails to withstand scrutiny and is at best equivocal, given that the

18  document demonstrates that another company (Ansteel Group Corporation Ltd.) contributed capital to

19  purchase Pangang Group Co., Ltd. from at least 2009.

20       Even if the Court were to credit the Defendants' "evidence," the Defendants' argument that this

21  evidence establishes immunity under the FSIA plainly fails.  The Supreme Court held that, in

22  determining whether or not a company is a foreign instrumentality under the FSIA, the Court needs to

23  determine whether a majority of that company's shares or other ownership interest was owned by a

24  foreign state *at the time the suit is filed*.  *See Dole Food*, 538 U.S. at 478.  The operative charging

25  document, the Third Superseding Indictment, was filed on January 5, 2016 (ECF No. 971)—nearly two

26  years after Ansteel Group Corporation purportedly assumed ownership of Pangang Group Co., Ltd from

27

28

1   the PRC.  Therefore, by the defendant's own reasoning, the Defendants are not subject to the FSIA at

2   all.  *See id.*

3         Furthermore, the Defendants only provided "evidence" as to Pangang Group Co., Ltd.  Nothing

4   provided by Defendants changes the outcome with respect to subsidiaries Pangang Group Steel

5   Vanadium & Titanium Company, Ltd. ("PGSV"), Pangang Group Titanium Industry Company, Ltd.

6   ("PGTIC"), and Pangang Group International Economic & Trading Company, Ltd. ("PGIETC"), owned

7   by Pangang Group Co., Ltd.  The Supreme Court has rejected assertion of immunity under 28 U.S.C.

8   § 1603(b)(2) for companies owned indirectly by a foreign government through "one or more

9   intermediate corporate tiers."  *Pangang*, 6 F. 4th at 956 (quoting *Dole Food*, 538 U.S. at 473).  Nothing

10  provided by Defendants indicate that PGSV, PGTIC, or PGIETC are directly by the PRC, as opposed to

11  subsidiaries of Pangang Group Co., Ltd.  As a result, they are, at best, indirectly owned by the PRC and

12  not subject to the FSIA.

13  **III.    THIS COURT HAS JURISDICTION EVEN IF DEFENDANTS COULD ESTABLISH A
         PRIMA FACIE CASE UNDER THE FSIA**

14
15        As this Court has previously found, it has jurisdiction over this criminal matter even assuming

16  Defendants are "foreign states" under the FSIA.  *See* Order, ECF No. 1223, pp. 11–17.  Even assuming

17  Defendants meet their burden of persuasion, the Court previously found that even if the FSIA applies, its

18  exceptions also apply, and the Pangang Defendants were not invited to—and have not—presented

19  anything to disturb those findings.  *See Arizona v. California*, 460 U.S. 605, 618 n.8 (1983) (although

20  the "law of the case" doctrine does not apply to interlocutory orders, the Court should not "depart from a

21  prior holding" unless "convinced that it is clearly erroneous and would work a manifest injustice").  Nor

22  have they established a material difference in fact or law or a manifest failure by the Court to consider

23  material facts or dispositive legal arguments, as required by the local rules for moving for

24  reconsideration of a previous order.  *See* Civil Local Rule 7-9(b).

25         As this Court correctly held, the FSIA does not silently strip district courts of jurisdiction over

26  criminal cases, and its text, history, and purpose show that it was not meant to apply to provide

27  immunity to foreign instrumentalities that commit offenses in the United States.  It was not meant to

28  apply to federal criminal cases at all.  That is particularly true in the context of a prosecution under the

OPPOSITION TO SECOND MOTION TO DISMISS,
CR 11-0573 JSW

1  EEA, a statute enacted after the FSIA where Congress explicitly provided for separate criminal

2  sanctions for violations involving foreign states, instrumentalities, and agents, at least as beneficiaries.

### A. This Court has jurisdiction over this case alleging "offenses against the laws of the United States," and the text, structure, and history of the FSIA do not provide otherwise

5   This Court correctly determined that it had jurisdiction over this criminal case.  Under 18 U.S.C.

6  § 3231, the "district courts of the United States shall have original jurisdiction . . . of all offenses against

7  the laws of the United States."  *See* Order, ECF No. 1223.  The Pangang Defendants are charged with

8  "offenses against the laws of the United States"—specifically, the EEA, 18 U.S.C. § 1831(a)(1)–(5).  "It

9  is hard to imagine a clearer textual grant of subject-matter jurisdiction" than Section 3231 as to criminal

10  cases.  *In re Grand Jury Subpoena*, 912 F.3d at 628.  "And nothing" in the text of the FSIA "expressly

11  displaces section 3231's jurisdictional grant."  *Id.*  Accordingly, the Defendants' motion, like the last

12  one, should be denied.

13   In arguing to the contrary, the Pangang Defendants again contend that Congress stripped the

14  district court of jurisdiction over this criminal case through enactment of the FSIA.  But that statute

15  (1) never mentions criminal jurisdiction or criminal cases at all in its text, (2) was designed to address

16  uncertainty and entanglements caused by private litigants suing foreign countries, who then appealed to

17  the State Department to recommend immunity, and (3) has never been construed by any court to bar a

18  federal criminal prosecution through want of jurisdiction.  Each of these issues cuts strongly against the

19  Pangang Defendants' suggested statutory construction.

### 1. The text of the FSIA does not mention criminal cases, in contrast to the very clear statutory text of Section 3231 and implications of the EEA

22   The FSIA "contains a comprehensive set of legal standards governing claims of immunity in

23  every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities."

24  *Verlinden, B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488 (1983).  The FSIA's text, read "as a whole,"

25  *Samantar v. Yousuf*, 560 U.S. 305, 319 (2010), demonstrates that the FSIA is exclusively civil in its

26  application.

27   The FSIA begins by conferring jurisdiction over "any nonjury civil action" in which a foreign

28  state is not immune.  28 U.S.C. § 1330(a); *see Houston v. Murmansk Shipping Co.*, 667 F.2d 1151, 1154

1   (4th Cir. 1982) ("Congress apparently did not intend the phrase 'nonjury civil action' to define the

2   district court's jurisdiction.  Rather, it appears that the phrase was intended to serve as a shorthand way

3   of ensuring that actions against foreign states would be tried without a jury").  The FSIA's procedures

4   for asserting immunity or other jurisdictional limits likewise address civil actions.  *See* 28 U.S.C.

5   § 1441(d) (removal of "[a]ny civil action"); *id.* § 1608(d) (deadline for serving "an answer or other

6   responsive pleading to the complaint").  The FSIA's other procedural provisions have a uniform focus

7   on civil actions.  *See, e.g.*, *id.* § 139(f) (venue); *id.* § 1608(a), (b) (service rules).  And the statutory

8   findings and declaration of purpose refer to the "rights of both foreign states and litigants," without

9   reference to governments or prosecutors that conduct criminal proceedings.  *Id.* § 1602.

10          This civil focus and absence of reference to criminal proceedings is particularly instructive

11   because the Supreme Court has advised that any "immunity defense made by a foreign sovereign in an

12   American court must stand on the [FSIA's] text.  Or it must fall."  *Republic of Argentina v. NML*

13   *Capital, Ltd.,* 573 U.S. 134, 141 (2014).  "The Act's careful calibration of remedies among the listed

14   types of defendants suggests that Congress did not mean to cover other types of defendants never

15   mentioned in the text."  *Samantar*, 560 U.S. at 319.  Indeed, the Court emphasized that it would not

16   further Congress's purpose to confer immunity in circumstances where FSIA contains not "so much as a

17   word spelling out how and when" such immunity applies.  *Samantar*, 560 U.S. at 322.  So, too, here:

18   despite detailed provisions covering how immunity applies in scenarios from admiralty to mortgage

19   foreclosure actions to art exhibits—including a detailed special provision for Nazi-era claims—FSIA has

20   not one word about "how and when" immunity applies to those charged with federal criminal offenses.

21   28 U.S.C. § 1605(b), (d), (h).  "Reading the FSIA as a whole," then, "there is nothing to suggest" that

22   this Court "should read" FSIA to cover criminal cases.  *Samantar*, 560 U.S. at 319.  Under such

23   circumstances, FSIA does not confer immunity on the Pangang Defendants or deprive the district court

24   of jurisdiction.[2]

25

26   [2]  Moreover, to ascribe jurisdiction-stripping effect over all federal criminal cases involving certain
     parties to FSIA in the absence of any mention of criminal cases in the statutory text seems incongruous

27   with (1) the general approach courts take to jurisdiction-stripping statutory interpretation, *cf. ANA Intern., Inc. v. Way,* 393 F.3d 886, 891 (9th Cir. 2004) (reiterating that "as a matter of the interpretive

28   enterprise itself, the narrower construction of a jurisdiction-stripping provision is favored over the

OPPOSITION TO SECOND MOTION TO DISMISS,
CR 11-0573 JSW

That conclusion follows even more forcefully when considering the particular charges in this case—violations of the Economic Espionage Act of 1996, 18 U.S.C. §§ 1831–39.  Congress passed that statute many years after enactment of the FSIA, and it contains criminal espionage provisions expressly requiring the involvement of a foreign government, instrumentality, or agent, at least as a beneficiary. *See* 18 U.S.C. § 1831(a) ("Whoever, intending or knowing that the offense will benefit any foreign government, foreign instrumentality, or foreign agent" knowingly engages in certain conduct related to economic espionage violates statute); (Third Superseding Indictment charging violations of 18 U.S.C. § 1831(a)(1)–(5)), ECF No. 971.  "The legislative history indicates that § 1831 is designed to apply only when there is evidence of foreign government sponsored or coordinated intelligence activity." *United States v. Hsu*, 155 F.3d 189, 195 (3d Cir. 1998) (internal quotation marks and citation omitted) (quoting legislative history).  That same legislative history explains that the EEA was designed to target activity ranging from a "foreign government that uses its classic espionage apparatus to spy on a company, to the two American companies that are attempting to uncover each other's bid proposals, or to the disgruntled former employee who walks out of his former company with a computer diskette full of engineering schematics." *Id.* at 201 (internal quotation marks and citation omitted).  The Pangang Defendants do nothing to explain how this legislative intent to target the actions of, among others, foreign governments under the EEA accords with their claimed immunity.  Indeed, the Pangang Defendants' position—that they are entitled to absolute immunity when they are alleged to have engaged in the exact form of state-sponsored economic espionage targeted by the EEA—underscores the dubious nature of their claim for dismissal under the FSIA.  At a minimum, it seems particularly doubtful that Congress, while writing a statute that would often lead to the prosecution of foreign state actors engaged in economic espionage, nevertheless silently intended to provide those same foreign instrumentalities absolute immunity from

---

broader one"), and (2) the rule that, "[i]n the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable," *Morton v. Mancari*, 417 U.S. 535, 550 (1974).  Here, first, the narrower interpretation of FSIA's jurisdictional provisions leaves out application to criminal cases, which go otherwise unmentioned in the text.  Second, the two statutes—Section 3231 and the FSIA—are not irreconcilable:  one confers jurisdiction over "all" criminal cases to district courts, and the other provides limited avenues for relief against foreign sovereigns in the context of civil liability.

prosecution.  In the absence of textual support clearly indicating otherwise in the FSIA, this Court

should not provide the Pangang Defendants with such relief.

### 2.    The history of the FSIA indicates application to civil, not criminal, cases

Historically, the grant or denial of foreign state immunity was "the case-by-case prerogative of

the Executive Branch."  *Republic of Iraq v. Beaty*, 556 U.S. 848, 857 (2009); *see Samantar*, 560 U.S. at

311–13, 320.  That rule flowed from the Executive Branch's constitutional primacy in foreign affairs.

*See Republic of Mexico v. Hoffman*, 324 U.S. 30, 34–36 (1945).  Until 1952, if a foreign state sought

immunity from a private civil action, the Executive generally requested a court to recognize immunity.

*Samantar*, 560 U.S. at 311–312.

In 1952, this practice changed: the Executive Branch decided to grant immunity from suit to

foreign states for "sovereign or public acts" but not "private acts."  *Alfred Dunhill of London, Inc. v.*

*Republic of Cuba*, 425 U.S. 682, 711–15 (1976) (reprinting Letter from Jack B. Tate, Acting Legal

Adviser, U.S. Dep't of State, to Philip B. Perlman, Acting Att'y Gen. (May 19, 1952)).  This policy led

to "diplomatic pressure on the State Department" from foreign governments to grant immunity in private

suits, and "political considerations led to suggestions of immunity in cases where immunity would not

have been available" under the new policy.  *Verlinden*, 461 U.S. at 487.

To address the "considerable uncertainty" faced by "private litigant[s]" due to inconsistent

immunity determinations resulting from the Executive Branch having requests for immunity thrust upon

it, Congress passed the FSIA in 1976. *See* H.R. Rep. No. 1487, 94th Cong., 2d Sess. 9 (1976) ("1976

House Report"); *see also Verlinden*, 461 U.S. at 488.  Passage of the FSIA was supported by the

Departments of State and Justice.  1976 House Report 6.  In passing the bill, the House of

Representatives noted the need for "comprehensive provisions" to "inform parties when they can have

recourse to the courts to assert a legal claim against a foreign state," 1976 House Report 7, and

repeatedly referred to "plaintiffs," "suit[s]," "litigants," and "liability," *id.* at 6–8, 12—all terms

consistent with civil actions.  Moreover, the House introduced the need for the bill with the following

observation and examples:

> American citizens are increasingly coming into contact with foreign states
> and entities owned by foreign states. . . .  Instances of such contact occur
> when U.S. businessmen sell good to a foreign state trading company, and

disputes may arise concerning the purchase price.  Another is when an American property owner agrees to sell land to a real estate investor that turns out to be a foreign government entity and conditions in the contract of sale may become a subject of contention.  Still another example occurs when a citizen crossing the street may be struck by an automobile owned by a foreign embassy.  At present, there are no comprehensive provisions in our law available to inform parties when they can have recourse to the courts to assert a legal claim against a foreign state.

*Id.* at 6–7.  The problems identified, language used, and examples cited by Congress in passing the FSIA all indicate an interest in providing civil litigants with more certainty—not displacing federal criminal proceedings.  As the Supreme Court has stated, "[t]he FSIA was adopted . . . to address a modern world where foreign state enterprises are every day participants in commercial activities, and to assure litigants that decisions regarding claims against states and their enterprises are made on purely legal grounds." *Samantar*, 560 U.S. at 323 (internal quotation marks omitted) (citing 1976 House Report).

This history and context do not suggest that the Executive Branch or Congress had any intention of passing a statute that provided foreign government-controlled entities free rein to violate criminal laws with impunity.  The FSIA's purposes do not support such a construction.  The federal government, not a private party, controls whether to initiate a federal criminal matter against a foreign-government-owned commercial enterprise.  *Pasquantino v. United States*, 544 U.S. 349, 369 (2005); *see also United States v. Sinovel Wind Grp. Co.*, 794 F.3d 787, 792 (7th Cir. 2015).  Accordingly, immunity in criminal matters "simply was not the particular problem to which Congress was responding." *Samantar*, 560 U.S. at 323 (regarding officials' civil immunity).

**3.      No court has ever applied the FSIA to bar a federal criminal prosecution**

In addition to inconsistency with the FSIA's history, purpose, and text, the Pangang Defendants' argument suffers from a lack of decisional support.  The Supreme Court has repeatedly described FSIA as addressed to civil actions and has never suggested that it applies to the criminal context.  *See Verlinden*, 461 U.S. at 488 (FSIA provides "a comprehensive set of legal standards governing claims of immunity in every *civil* action against a foreign state or its political subdivisions, agencies, or instrumentalities") (emphasis added); *accord NML Capital, Ltd.*, 573 U.S. at 141; *Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004).  The only courts to have addressed the question in criminal prosecutions or investigations have held that the FSIA does not apply.  *See United States v. Noriega*, 117

OPPOSITION TO SECOND MOTION TO DISMISS,
CR 11-0573 JSW

F.3d 1206, 1212 (11th Cir. 1997); *In re Grand Jury Proceeding Related To M/V Deltuva*, 752 F. Supp.

2d 173, 176–180 (D.P.R. 2010); *United States v. Hendron*, 813 F. Supp. 973, 974–977 (E.D.N.Y. 1993).

The D.C. Circuit recently examined these issues at some length in a decision with instructive

parsing of text, history, structure, and precedent. *See In re Grand Jury Subpoena*, 912 F.3d at 625–33.

The court ultimately assumed without deciding that the FSIA did apply to criminal matters and

nevertheless denied the defendants' claimed immunity under the commercial activity exception. In so

doing, however, the court rejected the defendant's argument that the FSIA stripped district courts of

jurisdiction over criminal cases. "[A] reading that embraces absolute immunity in criminal cases is

much harder to reconcile with the Act's context and purpose." *Id.* at 629. The court observed that such

a result would allow sweeping negative consequences: "[A] foreign-sovereign-owned, purely

commercial enterprise operating within the United States could flagrantly violate criminal laws and the

U.S. government would be powerless to respond save through diplomatic pressure. . . . We doubt very

much that Congress so dramatically gutted the government's crime-fighting toolkit. . . ." *Id.* at 629–30

(internal citations and quotation marks omitted). In particular, the court found no justification for such

significant ramifications for criminal cases in the FSIA's text or history. *Id.* at 630 (observing that "if

Congress really intended [that result,] . . . one would expect that answer to show up clearly in the Act's

text, or at least" in legislative history, yet "the Act and its legislative history do not say a single word

about possible criminal proceedings" (internal quotation marks and citations omitted)). Instead, the

court concluded, canvassing scholarship in support of its reading, that "the relevant reports and hearings

suggest Congress was focused, laser-like, on the headaches born of private plaintiffs' civil actions

against foreign states." *Id.* at 630 (citation omitted).

Even more recently, in October 2021, the Second Circuit published held that a district court

"plainly has subject matter jurisdiction over the federal criminal prosecution of" a foreign

instrumentality "pursuant to § 3231." *United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336 (2d. Cir.

2021). The court did not ultimately decide "whether § 1604 of FSIA confers immunity on foreign

sovereigns in the criminal context" because even assuming it did, the activities in question fell under the

1    commercial activities exception. *Id*. at 347–48. In other words, another circuit has joined the D.C.

2    Circuit, and this Court, on that score.

3        These principles apply with equal force in this case. The Pangang Defendants' position would

4    confer absolute immunity on foreign government-controlled businesses that committed substantial

5    economic espionage in the United States—espionage that domestic or foreign-owned but not

6    government-controlled competitors could not commit without criminal sanction.[3] The government

7    would be powerless to stop this activity except through diplomatic pressure.[4] Inferring such

8    Congressional intent from the FSIA, where no mention of criminal cases is made, is simply implausible

9    and should not be adopted. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982)

10   ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative

11   interpretations consistent with legislative purpose are available."); *accord Tovar v. Sessions*, 882 F.3d

12   895, 904 (9th Cir. 2018).

13       Such an interpretation would also conflict with the federal government's traditional role in

14   deciding whether to prosecute or subpoena a foreign-government-owned business—decisions the

15   government has exercised for decades. *See, e.g.*, *United States v. Ho*, 3:16-CR-46-TAV-HBG-1, 2016

16   WL 5875005 (E.D. Tenn. Oct. 7, 2016); *M/V Deltuva*, 752 F. Supp. 2d at 176–80; *United States v. Jasin*,

17

---

18   [3] Government-controlled commercial entities "assume a variety of forms, including a state trading

19   corporation, a mining enterprise, a transport organization such as a shipping line or airline, a steel
     company, a central bank, an export association, a governmental procurement agency or a department or

20   ministry which acts and is suable in its own name." 1976 House Report 16. This list has only grown in
     size and scope since passage of the FSIA with the exponential growth of sovereign wealth funds. *See,*

21   *e.g.*, Larry Catá Backer, *Sovereign Investing in Times of Crisis: Global Regulation of Sovereign Wealth*

22   *Funds, State-Owned Enterprises, and the Chinese Experience*, 19 Transnat'l L. & Contemp. Probs. 3, 4–
     5 (2010) ("Over the last decade, [sovereign wealth funds] became more visible and more aggressive in

23   the scope and form of their interventions in global finance. State-owned enterprises began to operate
     indirectly through subordinate legal persons that operate like privately held multinational corporations.

24   In this new form, sovereigns are becoming a more significant presence in global markets, as owners as
     well as investors. More importantly, sovereign owners have begun to coordinate their economic

25   activities for economic and sovereign goals.").

26   [4] As shown in this very case, such diplomatic pressure is not a reliable method by which to ensure

27   general enforcement of United States criminal law. *In re Pangang Grp. Co.*, 901 F.3d 1046, 1050 (9th
     Cir. 2018)(Chinese government refused to serve summonses on Pangang Defendants in 2012), 1053

28   (Chinese agency refused to serve summonses on Pangang Defendants in 2016).

1    No. CRIM. A. 91-00602-08, 1993 WL 259436 (E.D. Pa. July 7, 1993); *In re Sealed Case*, 825 F.2d 494,

2    495 (D.C. Cir. 1987) (per curiam); *see also, e.g.*, *United States v. Statoil, ASA*, No. 06-CR-960

3    (S.D.N.Y. Oct. 13, 2006) (criminal information and deferred prosecution agreement against Norwegian

4    state-owned oil company); *United States v. Aerlinte Eireann*, No. 89-CR-647, Dkt. No. 12 (S.D. Fla.

5    Oct. 6, 1989) (guilty plea of airline then owned by Ireland).  That is perhaps why "no reported court

6    decision has dismissed an indictment or otherwise suppressed a criminal prosecution based on immunity

7    conferred by the FSIA."  Restatement (Fourth) of Foreign Relations Law of the United States, § 451 rep.

8    n.4 (2018).

9         **B.      If the FSIA did apply to criminal cases, its exceptions apply as well**

10        Even if this Court determined that the FSIA did apply to criminal cases to generally confer

11   immunity from federal prosecution on foreign instrumentalities that violate the law, the FSIA's

12   exceptions to immunity would then also apply.  The text of the FSIA indicates that all of its exceptions

13   apply "in any case" meeting the circumstances of the particular exception.  28 U.S.C. § 1605(a).  As the

14   D.C. Circuit held, and this Court previously agreed, this expansive statutory text "easily resolves this

15   issue"—whether the FSIA's exceptions apply to criminal cases—in favor of applicability.  *In re Grand*

16   *Jury Subpoena*, 912 F.3d at 632.

17        Nevertheless, the Pangang Defendants insist that, while the FSIA silently confers absolute

18   immunity in federal criminal cases, the statute's provision that its exceptions apply to "any case" does

19   not include criminal cases.

20        **1.      The Pangang Defendants' conduct falls within the commercial activity**
21               **exception to the FSIA and therefore they cannot invoke its protections**

22        Assuming arguendo that the FSIA applies to criminal cases, the Pangang Defendants would still

23   not be immune here because, as this Court correctly found after considering the Defendants' first try at

24   this argument, their conduct falls within the "commercial activity exception."  That exception provides

25   that no immunity exists under the FSIA where the

26            action is based [1] upon a commercial activity carried on in the United
           States by the foreign states; or [2] upon an act performed in the United
27         States in connection with a commercial activity of the foreign state
           elsewhere; or [3] upon an act outside the territory of the United States in

28

> connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).  In turn, "commercial activity" is defined as "either regular course of commercial conduct or a particular commercial transaction or act.  The commercial character of any activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(e).  Congress deemed "probably the most important instance in which foreign states are denied immunity" the circumstance where a state "engages in a commercial activity."  1976 House Report 18.

The commercial activity exception captures when a foreign state "acts in the manner of a private player within the market."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (internal quotation marks and citation omitted).  The key inquiry focuses on "whether the particular actions that the foreign state performs . . . are the type of actions by which a private party engages in trade and traffic or commerce," *Embassy of the Arab Rep. of Egypt v. Lasheen*, 603 F.3d 1166, 1170 (9th Cir. 2010) (internal quotation marks and citation omitted), or whether the powers being exercised are those "peculiar to sovereigns," *Nelson*, 507 U.S. at 360.  Significantly, in engaging in this analysis, courts look not to the purpose or motive behind the foreign state's actions, but rather whether those actions "are the *type* of actions by which a private party engages in" commerce.  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (citations omitted).  "[A]n activity is commercial unless it is one that only a sovereign state could perform."  *Park v. Shin*, 313 F.3d 1138, 1145 (9th Cir. 2002).

Applying these principles, this Court previously that the Pangang Defendants' alleged activities fit within this statutory exception.  First, the Pangang Defendants' conduct falls within the first clause of the commercial activity exception, as this case is "based upon a commercial activity carried on in the United States by the foreign states."  28 U.S.C. § 1605(a)(2).  The offenses alleged here—conspiracy and attempt to steal DuPont's trade secrets—arise from a contractual relationship between the Pangang Defendants, on the one hand, and co-defendant Walter Liew and his company USAPTI, on the other.  Specifically, the Third Superseding Indictment alleges $27 million in contracts between those parties, located in the United States.  Those contracts involved agreeing to engage in the production of titanium dioxide in China at a manufacturing plant.  A legal contract—even one undertaken for sovereign gain—

constitutes commercial activity under the FSIA. *Park*, 313 F.3d at 1145 ("For example, a contract to purchase military supplies, although clearly undertaken for public use, is commercial in nature and therefore subject to the commercial activity exception." (internal quotation marks and citation omitted)). Indeed, even if the contracts here are construed as contracts to commit an illegal act, this Court has held that "an illegal contract constitutes commercial activity under the FSIA." *Adler v. Federal Republic of Nigeria*, 219 F.3d 869, 875 (9th Cir. 2000). The contracts that the Pangang Defendants entered into in this case in furtherance of their conspiracy and attempt clearly place their activities within the first clause of the commercial activity exception.

That conclusion is further supported when considering that these contracts are paired with even more commercial activity in the United States. As this Court correctly found in its prior ruling, the Pangang Defendants allegedly engaged in a number of other commercial acts within the United States in connection with the commercial activity of manufacturing and operating the plant in China, including preparing designs for the projects and meeting about them.

The Court's prior holding is only further supported by *Turkiye Halkbank*, in which the Second Circuit recently found a Turkish state-owned bank's communications with Treasury officials were actions taken in the Unites States in connection with a foreign commercial activity under 28 U.S.C. § 1605(a)(2). *See Turkiye Halk Bankasi A.S.*, 16 F.4th 336. In that case, Halkbank, which is majority owned by the Government of Turkey, was charged with violating U.S. Sanctions imposed against Iran. *See id*. Like the Pangang Defendants, Halkbank argued that they were immune from criminal prosecution based on the FSIA. The Second Circuit, like this Court and every other court to consider the question, rejected the argument and held that "even assuming that FSIA confers immunity to foreign sovereigns in criminal cases, Halkbank's charged offense conduct would fall within FSIA's exception to sovereign immunity for commercial activity." *Id*. at 347. The Second Circuit, in analyzing the alleged actions of Halkbank, reasoned that "those core acts constitute 'an activity that could be, and in fact regularly is, performed by private-sector businesses,' and concluded that "those acts are commercial, not sovereign, in nature." *Id*. at 350, (*citing Pablo Star Ltd. v. Welsh Government*, 961 F.3d 555, 562 (2d Cir. 2020))—the same logic used by this Court in its prior ruling.

OPPOSITION TO SECOND MOTION TO DISMISS,
CR 11-0573 JSW

### 2. The Pangang Defendants waived immunity by engaging in years of active participation in this case without ever asserting immunity

As this Court correctly found, even if the Pangang Defendants had some immunity conferred under the FSIA and their activity did not fall within the commercial activity exception, they impliedly waived immunity by extensively litigating the case before asserting that right.[5]  The FSIA provides that its immunity provisions do not apply where "the foreign state has waived its immunity either explicitly or by implication . . . ."  28 U.S.C. § 1605(a)(1).  While the waiver exception is "narrowly construed," this Court has described several different scenarios in which implied waiver may be found, including where a foreign state "[1] has agreed to arbitration in another country; . . . [2] has agreed that a contract is governed by the law of a particular country; and . . . [3] has filed a responsive pleading in a case without raising the defense of sovereign immunity." *Barapind v. Gov't of Republic of India*, 944 F.3d 824, 829 (9th Cir. 2016) (internal quotation marks and citation omitted); *see also* 1976 House Report 18 (discussing same).  The Ninth Circuit has stated that "these circumstances are not an exclusive list of the circumstances giving rise to implied waivers," and has also recognized implied waiver where, for example, "a written agreement entered into by a foreign sovereign contemplates adjudication of a dispute by the United States courts." *Barapind*, 944 F.3d at 829 (internal quotation marks and citation omitted).  Finally, the Eleventh Circuit has held that criminal defendants can waive any potential FSIA immunity through repeated appearances and litigation participation without asserting such immunity. *See United States v. Campa*, 529 F.3d 980, 1001 (11th Cir. 2008) (concluding as matter of law that defendant waived FSIA immunity, if any existed, in criminal case through participation in litigation for two years, including filing motions and setting trial date, prior to raising defense of immunity).

## IV. DEFENDANTS' POLICY ARGUMENTS HAVE BEEN WAIVED AND, REGARDLESS, ARE UNPERSUASIVE

The Pangang Defendants further argue that even if FSIA does not confer foreign sovereign immunity in criminal cases, it is nevertheless immune from criminal prosecution under common law.

---

[5]  Review of "a determination whether participation by a foreign state in litigation is so extensive as to waive a defense of sovereign immunity" is for abuse of discretion.  *United States v. Campa*, 529 F.3d 980, 992 (11th Cir. 2008) (citing *Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*, 727 F.2d 274, 278 (2d Cir.1984)).

1    The Defendants allude to the dangerousness of allowing this case to proceed, claiming that it is the first

2    such prosecution.  But the Pangang Defendants only point to prudential reasons this case should not

3    move forward, and they fail to cite any authority for dismissal on these bases.[6]

4           Assuming *arguendo* that FSIA does confer sovereign immunity in criminal cases—which it does

5    not—its enactment displaced any pre-existing common-law practice. *Turkiye Halk Bankasi A.S.*, 16

6    F.4th at 350-51 (*citing Samantar*, 560 U.S. at 312-13; *Argentine Republic v. Amerada Hess*, 488 U.S.

7    428, 435 (1989)).  Further, even assuming that FSIA did not supersede the pertinent common law, any

8    foreign sovereign immunity at common law also had an exception for a foreign state's commercial

9    activity, just like FSIA's commercial activity exception.  *Id.* (*citing Verlinden*, 461 U.S. at 487-88).

10   Indeed, under the restrictive view of immunity under customary international law, "states are generally

11   required to afford immunity from jurisdiction to adjudicate to foreign states in respect to claims arising

12   out of government activities

13   . . .  but not in respect to claims arising out of activities of a kind carried on by private persons . . .

14   including commercial activities." Restatement (Fourth), The Foreign Relations Law of the United States

15   § 454 cmt. h.

16          Finally, in any event, at common law, sovereign immunity determinations were the prerogative

17   of the Executive Branch.  *See Verlinden*, 461 U.S. at 486.  In bringing this prosecution, the Executive

18   Branch has determined that the Pangang Defendants should not be granted immunity from criminal

19   prosecution for the alleged conduct.  That determination is conclusive.  *Ex Parte Republic of Peru*, 318

20   U.S. 578, 589 (1943); *see also Noriega,* 117 F.3d at 1212 ("The Executive Branch has not merely

21   refrained from taking a position on this matter; to the contrary, by pursuing Noriega's capture and this

---

[6] The defendants had a chance to raise and present these factual assertions or legal claims prior to the pretrial motion deadline in 2019.  They did not do so, and they have not provided good cause for their failure given that *Dole Foods* existed prior to that deadline.  Therefore, under Rule 12, their new claims as to ownership or other bases for immunity are waived.  Just because the case has been remanded (after they lost) does not mean this Court has to entertain new pretrial motion grounds.  *See United States v. Wright*, 716 F.2d 549–50 (9th Cir. 1983) (holding that because appellant could have placed legality of seizure of items in question in first appeal but did not, district court on remand did not need to hold evidentiary hearing and could rely on initial suppression ruling); *accord United States v. Nagra*, 147 F.3d 875, 882 (9th Cir. 1998); *see also United States v. Thompson*, 335 F.3d 782, 784–85 (8th Cir. 2003) (citing *Wright*).

OPPOSITION TO SECOND MOTION TO DISMISS,
CR 11-0573 JSW

23

1    prosecution, the Executive Branch has manifested its clear sentiment that Noriega should be denied

2    head-of-state immunity. Noriega has cited no authority that would empower a court to grant head-of-

3    state immunity under these circumstances."); *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009) (deferring

4    to Executive's determination of immunity under common law).  It remains the responsibility and

5    prerogative of the Executive Branch to make a case-by-case determination of issues that implicate the

6    Nation's foreign affairs: "[B]y electing to bring this prosecution, the Executive has assessed this

7    prosecution's impact on this Nation's relationship with [a foreign state]." *Pasquantino*, 544 U.S. at

8    369; *see also United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (recognizing that

9    the Executive is "the sole organ of the federal government in the field of international relations").

10   Defendant's argument that this prosecution is unique fails to set out a legal basis for this Court to

11   dismiss the charges.

12   **IV.      CONCLUSION**

13          For the foregoing reasons, the Court should deny the Pangang Defendants' second motion to

14   dismiss the Third Superseding Indictment and allow this case to proceed to a trial on the merits.

15   Dated: December 14, 2021.                          Respectfully submitted,

16

17                                                       STEPHANIE M. HINDS
                                                         Acting United States Attorney

18

19                                                       */s/ Colin Sampson*
                                                         COLIN SAMPSON

20                                                       Assistant United States Attorney
                                                         MATTHEW J. MCKENZIE
                                                         Trial Attorney, National Security Division

21

22

23

24

25

26

27

28